## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ROLAND G. LOVERN, JR.**, | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:13cv00014 |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Roland G. Lovern, ("Lovern"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2011). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Lovern protectively filed a previous DIB claim on July 3, 2008, alleging disability as of April 30, 2008, which was denied by decision dated October 28, 2009.[1] (Record, ("R."), at 64-74.) Lovern protectively filed his current application for DIB on October 28, 2009, alleging disability as of October 29, 2009,[2] due to a back / spinal injury, anxiety, depression, severe high blood pressure, nerve damage in his left leg and leg pain. (R. at 18, 210-13, 243, 274.) The claim was denied initially and on reconsideration. (R. at 108-12, 114-18, 119, 120-22, 124-26.) Lovern then requested a hearing before an administrative law judge, ("ALJ"), (R. at 127.) The hearing was held on October 28, 2011, by video conferencing, at which Lovern was represented by counsel. (R. at 35-60.)

By decision dated February 2, 2012, the ALJ denied Lovern's claim. (R. at 18-34.) The ALJ found that Lovern met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2013. (R. at 20.) The ALJ also found that Lovern had not engaged in substantial gainful activity

---

[1] Because Lovern filed a prior application for DIB, which was denied by decision dated October 28, 2009, this prior decision is res judicata as to the time period considered. That being the case, the question before the court is whether Lovern was disabled at any time between October 29, 2009, the date following the ALJ's prior denial, and February 2, 2012, the date of the current ALJ's denial. Any facts included in this Memorandum Opinion not directly related to this time period are included for clarity of the record.

[2] Lovern lists October 24, 2009, as his alleged onset date in his applications. However, because this date was contained within the prior time period considered by the previous ALJ, the earliest onset date that Lovern can allege is October 29, 2009, the date following the date of the previous ALJ's decision. (R. at 64-74.)

Case 2:13-cv-00014-PMS   Document 17   Filed 09/29/14   Page 2 of 38   Pageid#: 702

since October 24, 2009.[3] (R. at 20.) The ALJ found that the medical evidence established that Lovern suffered from a severe impairment, namely status-post lamincetomy, but he found that Lovern did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20-23.) The ALJ found that Lovern had the residual functional capacity to perform sedentary work[4] which did not require more than occasional stooping, kneeling, crawling and crouching, and which allowed for positional changes every 45 minutes. (R. at 23-26.) The ALJ found that Lovern could perform his past relevant work as a product support advisor / customer service worker. (R. at 26.) Based on Lovern's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ also found that jobs existed in significant numbers in the national economy that Lovern could perform, including jobs as a ticket checker, a telephone clerk and a general office clerk. (R. at 28.) Thus, the ALJ found that Lovern was not under a disability as defined under the Act from October 24, 2009,[5] through the date of the decision, and was not eligible for benefits. (R. at 28.) *See* 20 C.F.R. §§ 404.1520(f), (g) (2013).

After the ALJ issued his decision, Lovern pursued his administrative

---

[3] For reasons already stated, the ALJ should have considered whether Lovern had performed substantial gainful activity since October 29, 2009. Nonetheless, because the ALJ's finding necessarily also finds that Lovern had not performed substantial gainful activity since October 29, 2009, any error is harmless.

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2013).

[5] Again, the appropriate date that the ALJ should have considered is October 29, 2009.

Case 2:13-cv-00014-PMS   Document 17   Filed 09/29/14   Page 3 of 38   Pageid#: 703

appeals, (R. at 13), but the Appeals Council denied his request for review. (R. at 1-4.) Lovern then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2013). The case is before this court on Lovern's motion for summary judgment filed November 26, 2013, and the Commissioner's motion for summary judgment filed December 23 2013.

## II. Facts

Lovern was born in 1978, (R. at 42, 210, 214, 239), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and some college course work. (R. at 43.) He has past relevant work experience as a field supervisor for a communications company, a butcher and a product support advisor in a call center for a consumer electronics business. (R. at 44-46, 244, 254.) Lovern testified that he read magazines regularly and a novel on occasion. (R. at 43.) He testified that he last worked in March or April 2008 as a technical support advisor in a call center for electronic equipment. (R. at 44.) Lovern testified that he underwent back surgery in August 2000, which helped for a year or two, but that the pain slowly returned. (R. at 47-48.) He stated that he experienced low back pain that radiated into both legs to the calves, the left worse than the right, with bilateral leg weakness, loss of left leg mass and some numbness in the left leg. (R. at 49, 51-52.) Lovern testified that he had been considering undergoing another surgery since 2009. (R. at 48-49.) He stated that he spent a significant part of the day in bed and that he used a crutch and a cane at times. (R. at 51.) Lovern testified that his back pain had worsened over the previous couple of years. (R. at 52.) He stated that he used heating pads, hot baths and Icy Hot patches to help alleviate his back pain. (R. at 52-53.) He stated that he had constant leg pain. (R. at 49.) Lovern

testified that his current back pain was worse than the pain he experienced prior to his 2000 surgery. (R. at 53.)

Lovern estimated that he could walk for about 20 minutes before having to stop and rest and that he could sit for up to 30 minutes at a time in a supportive chair. (R. at 53.) He stated that he had to switch positions among his bed, a chair, a couch and a computer chair throughout the day to get comfortable. (R. at 53-54.) He stated that his wife performed 90 percent of household chores. (R. at 54.)

Lovern also stated that he had been taking anxiety medication for several years and that he had seen D. Kaye Weitzman, a counselor, since 2009. (R. at 49-50.) He stated that he had suffered from hypertension since age seven, which was controlled with medications. (R. at 49.) Lovern said that he also suffered from intermittent bouts of gout, usually in the left leg and usually lasting a few days four to five times annually. (R. at 49.) He stated that the gout also was controlled with medication. (R. at 50.)

Ann Marie Cash, a vocational expert, also was present and testified at Lovern's hearing. (R. at 54-58.) She classified his past work as a butcher and as a telephone and equipment installer, as performed by Lovern, as heavy[6] and skilled and as a customer service worker as sedentary and skilled. (R. at 55.) Cash testified that a hypothetical individual of Lovern's age, education and work history, who could occasionally lift and carry items weighing up to 35 pounds, frequently lift and carry items weighing up to 20 pounds, sit for six hours in an eight-hour

---

[6] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, he also can do medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2013).

workday, stand or walk for two hours in an eight-hour workday, and who must change positions every 45 minutes, could perform Lovern's past work as a customer service worker. (R. at 55.) Cash further tesitified that such an individual could perform other jobs existing in significant numbers in the national economy, including jobs as a general office clerk, a telephone clerk and a charge clerk, all at the sedentary level of exertion. (R. at 56.) Cash next testified that the same hypothetical individual, but who could lift and carry items weighing up to 15 pounds occasionally and up to eight pounds frequently, could perform the same previously named jobs at the sedentary level of exertion. (R. at 56.) When asked whether that same individual, but who also could not stoop, kneel, crouch, crawl or be exposed to moving machinery or heights, could perform those jobs, Cash testified that he or she could not. (R. at 56-57.) Next, Cash testified that the same individual, but who also would be limited to simple, routine, repetitive tasks in a work environment free of fast paced quota requirements and involving simple work-related decisions with only occasional interaction with the public, could still perform the jobs of a general office clerk, as well as jobs as a tube operator and a ticket checker. (R. at 57.) Cash testified that the same hypothetical individual, but who also would miss more than three days of work monthly due to his or her physical condition, could not perform any work. (R. at 57.) Lastly, Cash was asked to consider a hypothetical individual with the limitations set forth in the physical assessment completed by Dr. Patricia Vanover, M.D., on August 25, 2010. (R. at 58.) She testified that such an individual could not perform any jobs. (R. at 58.)

In rendering his decision, the ALJ reviewed medical records from Dr. Patricia Vanover, M.D.; Norton Community Hospital; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker; Holston Valley Medical Center; Solutions Counseling, LLC; Stone

-6-

Mountain Health Services; Dr. Kevin Blackwell, D.O.; Mountain View Regional Medical Center; and Johnston Memorial Hospital.

The record shows that on August 9, 2000, when Lovern was only 22 years old, he underwent complete bilateral L4 and L5 and partial S1 laminectomies and medial facetectomies with additional resection of the left L5-S1 herniated nucleus pulposus by Dr. Ken W. Smith, M.D., a neurosurgeon. (R. at 373-76.) When Lovern was discharged in satisfactory condition on August 11, 2000, it was noted that he had significant improvement of leg pain. (R. at 377-78.)

X-rays of Lovern's lumbar spine dated July 24, 2009, showed postsurgical changes at the L4-L5 level, some mild narrowing at the L4-L5 disc, as well as minimal change at L3-L4. (R. at 347.) Mild scattered degenerative spurring also was present with no spondylolysis. (R. at 347.) Mild degenerative changes also were present in the lower facets. (R. at 347.) It was concluded that there was no acute abnormality. (R. at 347.)

On September 21, 2009, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation at the request of Lovern's attorney. (R. at 355-65.) Lovern was fully oriented. (R. at 357.) He reported his daily activities to include watching television, reading and playing computer games, but basically staying at home. (R. at 359-60.) Lanthorn noted that Lovern had never received any formal psychiatric or psychotherapeutic intervention. (R. at 359.) Lovern's speech was clear and intelligible, and his grooming and hygiene were adequate. (R. at 359-60.) His affect was described as mixed. (R. at 360.) Lanthorn noted that it was evident at times that Lovern was in pain, had a flatness and bluntness to his affect, and his mood could best be described as somewhat

Case 2:13-cv-00014-PMS   Document 17   Filed 09/29/14   Page 7 of 38   Pageid#: 707

depressed. (R. at 360.) Lovern reported that antidepressant medication had been helpful and that he was only occasionally irritable. (R. at 360.) He denied suicidal or homicidal ideation, plans or intent, and he stated his energy level was fairly good. (R. at 360.) Lovern indicated no significant problems with memory or concentration. (R. at 360.) He admitted becoming nervous, shaky, jittery, slightly dizzy and having butterflies in his stomach at times. (R. at 360.) Lanthorn noted no signs of ongoing psychotic processes or any evidence of delusional thinking. (R. at 360.)

Lanthorn administered the Wechsler Adult Intelligence Sale – Fourth Edition, ("WAIS-IV"), the results of which he deemed valid. (R. at 361-62.) Lovern achieved a full-scale IQ score of 108, placing him in the average range of intellectual functioning. (R. at 361.) His Verbal Comprehension Index score, abstract and logical thinking score and ability to analyze abstract visual stimuli score all were in the high average range. (R. at 361.) Lovern scored in the superior range on the Vocabulary subtest, and he earned a Processing Speed Index score of 120, placing him in the superior range in his ability to quickly and correctly span, sequence or discriminate simple visual information. (R. at 361.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), the results of which were deemed valid. (R. at 362-63.) These results showed that Lovern may worsen ongoing physical symptoms in response to stress or may even develop new somatic areas of difficulty. (R. at 362.) They also indicated the presence of some depression, which contributed to social withdrawal and some erratic to poor concentration at times. (R. at 363.) The test results also indicated the presence of some anxiety, tension, worry and emotional discomfort. (R. at 363.) Lanthorn noted that Lovern seemed to worry to excess, which also contributed to problems with concentration. (R. at 363.) The test results also indicated that

Lovern was experiencing moderate levels of emotional distress, but that his concentration skills and memory were adequate. (R. at 363.) However, interpersonally, he was somewhat introverted, but did not mind meeting strangers, and he got along well with family members. (R. at 363.)

Lanthorn diagnosed Lovern with a pain disorder associated with both psychological factors and general medical conditions, chronic; and a mood disorder with major depressive-like episode, moderate, due to chronic physical problems, pain and limitations; and he assessed Lovern's then-current Global Assessment of Functioning, ("GAF"),[7] score at 55. (R. at 364.) Lanthorn recommended that Lovern consider receiving both psychiatric and psychotherapeutic intervention. (R. at 364.) Lanthorn found that Lovern had a pain disorder with complications and difficulties, as well as apparent depression secondary to his physical difficulties. (R. at 364.) He noted that, despite antidepressant medications, Lovern continued to show signs and symptoms associated with depression. (R. at 364.) Lovern also had some indications of ongoing anxiety, tension, restlessness and over reactivity to stress. (R. at 364-65.) Lanthorn felt that Lovern had no limitations regarding learning simple or moderately complicated tasks in the work setting and only mild limitations with regard to sustaining concentration and persisting at tasks. (R. at 365.) He opined that Lovern had mild to moderate difficulties dealing with the changes and requirements in a work setting. (R. at 365.)

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF score of 51 to 60 indicates that an individual has moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* DSM-IV at 32.

Lanthorn also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Lovern, finding that he had an unlimited or very good[8] ability to understand, remember and carry out simple job instructions, a good[9] ability to follow work rules, to relate to co-workers, to maintain attention and concentration and to understand, remember and carry out detailed, but not complex, job instructions and a fair[10] ability to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to understand, remember and carry out complex job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 366-68.) Lanthorn opined that Lovern would be absent more than two days monthly from work due to his impairments or treatment. (R. at 368.) He noted the diagnoses he rendered on September 21, 2009, as well as the accompanying psychological evaluation as support for this assessment. (R. at 368.)

On September 23, 2009, Lovern saw D. Kaye Weitzman, L.C.S.W., a licensed clinical social worker, for intake at Dr. Vanover's referral. (R. at 369.) Lovern noted that he had suffered from bouts of depression for the previous four to five years, which had worsened over the previous year. (R. at 369.) Weitzman described Lovern's mood as depressed with a subdued affect, his orientation and thought processes were intact, and his judgment and insight were deemed fair. (R. at 369.) Weitzman diagnosed major depressive disorder, recurrent episode,

---

8  An unlimited or very good ability is defined on the assessment as a "more than satisfactory" ability.  (R. at 366.)

[9] A good ability is defined on the assessment as a "limited but satisfactory" ability.  (R. at 366.)

[10] A fair ability is defined on the assessment as a "seriously limited, but not precluded" ability.  (R. at 366.)

-10-

moderate; a mood disorder; and generalized anxiety disorder. (R. at 369.) She placed Lovern's then-current GAF score at 40[11] and recommended individual therapy every two weeks. (R. at 369.) Weitzman also completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental) of Lovern, finding that he was mildly limited[12] in his abilities to carry out simple instructions and to make judgments on simple work-related decisions, moderately limited[13] in his abilities to understand and remember simple instructions, to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions and to interact appropriately with the public, supervisors and co-workers and moderately to markedly limited[14] in his ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 499-501.) Weitzman opined that Lovern would be absent from work more than two days monthly due to his impairments or treatment. (R. at 501.) Weitzman noted that this assessment was supported by Lovern's chronic pain following back surgery. (R. at 500.)

Lovern returned for counseling with Weitzman on October 2, 2009. (R. at 504.) He reported being short-tempered and grumpy, but getting better sleep than usual. (R. at 504.) Lovern endorsed moderate depression and panic attacks, but

---

[11] A GAF score of 31 to 40 indicates some impairment in reality testing or communication or marked impairment in several areas such as work or school, family relations, judgment, thinking or mood. *See* DSM-IV at 32.

[12] A mild limitation means "[t]here is a slight limitation …, but the individual can generally function well." (R. at 499.)

[13] A moderate limitation means "[t]here is more than a slight limitation …, but the individual is still able to function satisfactorily." (R. at 499.)

[14] A marked limitation means "[t]here is serious limitation in this area. There is a substantial loss in the ability to effectively function, resulting in unsatisfactory work performance." (R. at 499.)

-11-

mild anxiety, irritability and crying spells. (R. at 504.) Lovern's energy, appetite and sleep were "ok," but his attention / concentration was mildly decreased. (R. at 504.) Weitzman deemed Lovern's mood as depressed, his orientation and thought processes as intact and his judgment and insight as fair. (R. at 504.) Weitzman noted that Lovern was experiencing less stress. (R. at 504.)

On October 12, 2009, Lovern saw Dr. Patricia Vanover, M.D., with complaints of increasingly severe low back pain. (R. at 505-06.) He noted that his insurance refused to pay for an MRI. (R. at 505.) Lovern reported spending most of the day lying on the couch or reclining in a chair. (R. at 505.) He stated that he could care for his own needs and that he took pain medication sparingly due to fear of addiction. (R. at 505.) Lovern's blood pressure was 112/80, and he did not appear to be in distress. (R. at 505.) He had marked tenderness of the lumbosacral paraspinal muscles, and range of motion was restricted. (R. at 505.) Station was normal, but gait was slow and ambling. (R. at 505.) Dr. Vanover diagnosed hypertension, chronic low back pain, depression and chronic gout, and she prescribed Accupril, HCTZ, Prozac, Lortab, Allopurinol and Neurontin. (R. at 505-06.)

Lovern returned to Weitzman for counseling on November 6, 2009. (R. at 503.) He endorsed moderate depression, anxiety and panic attacks, mild irritability and crying spells and decreased energy, appetite and sleep. (R. at 503.) Weitzman described Lovern's mood as depressed with an anxious affect and found that he had intact orientation and thought processes and fair insight and judgment. (R. at 503.) She noted minimal progress. (R. at 503.) Weitzman completed another Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on Lovern on November 23, 2009, finding that he was either moderately or markedly

limited in his ability to perform all work-related mental abilities. (R. at 513-15.) Weitzman opined that Lovern would miss more than two days of work monthly due to his impairments or treatment. (R. at 515.) She specified Lovern's physical pain in support of her assessment, noting that it would cause limitations in his ability to focus. (R. at 513-14.)

On December 11, 2009, Dr. Vanover completed an Assessment Of Ability To Do Work-Related Activities (Physical) on Lovern, finding that he could lift and carry items weighing up to 10 pounds occasionally and up to eight pounds frequently. (R. at 522-24.) She further found that he could stand and / or walk a total of two hours in an eight-hour workday, but for only 30 minutes at a time. (R. at 522.) Dr. Vanover, likewise, found that Lovern could sit for a total of two hours in an eight-hour workday, but for only 30 minutes without interruption. (R. at 523.) She found that he could frequently balance, occasionally climb, stoop, kneel and crouch and never crawl. (R. at 523.) Dr. Vanover found that Lovern's ability to push and / or pull was affected by his impairment, but she did not specify in what way. (R. at 523.) She imposed no environmental restrictions. (R. at 524.) Dr. Vanover opined that Lovern would miss more than two days of work monthly due to his impairments or treatment. (R. at 524.)

On December 18, 2009, Dr. Vanover completed another Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on Lovern, finding that he was moderately limited in his abilities to understand, remember and carry out simple instructions and to make judgments on simple work-related decisions. (R. at 519-21.) She further found that he was markedly limited in his abilities to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions, to interact appropriately with the public,

-13-

supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 519-20.) Dr. Vanover opined that Lovern would miss more than two days of work monthly due to his impairments or treatment. (R. at 521.) She did not specify any findings to support this assessment. (R. at 519-21.)

Lovern returned to Weitzman on March 2, 2010, reporting the weather was intensifying his pain. (R. at 542.) However, he noted that Ambien helped him to "really rest[]," which had helped his mood a lot. (R. at 542.) Lovern reported moderate depression, anxiety and panic attacks and mild irritability and crying spells. (R. at 542.) Weitzman described Lovern's mood as depressed with an appropriately anxious affect, and he had intact orientation and thought processes and fair judgment and insight. (R. at 542.) Weitzman diagnosed a mood disorder and generalized anxiety disorder. (R. at 542.)

On April 2, 2010, Dr. Kevin Blackwell, D.O., completed a consultative examination at the request of the state agency. (R. at 527-31.) He noted Lovern's previous back surgery in 2000, which had helped for a while, but the pain had returned. (R. at 528.) Lovern reported that the pain was constant and worsened with activities. (R. at 528.) He noted pain in his legs, particularly on the left side. (R. at 528.) Lovern reported his typical pain as a five or six on a 10-point scale and an eight to nine on a bad day. (R. at 528.) His blood pressure was 148/110. (R. at 529.) Dr. Blackwell noted that Lovern did not appear to be in any acute distress, was alert, cooperative, oriented and had good mental status. (R. at 529.) Physical examination revealed symmetrical and balanced gait and good and equal shoulder and iliac crest height bilaterally. (R. at 530.) There was tenderness in the lumbar musculature on the left and in the thoracic muscles on the right, but upper and

lower joints had no effusions or obvious deformities. (R. at 530.) Upper and lower extremities were normal for size, shape, symmetry and strength, and Lovern's grip strength was good. (R. at 530.) Fine motor movements and skill activities of the hands were normal, as were reflexes. (R. at 530.) Romberg's sign[15] was negative, and proprioception was intact. (R. at 530.) Dr. Blackwell diagnosed chronic low back pain, depression and poorly controlled hypertension. (R. at 530.) Dr. Blackwell opined that Lovern could occasionally lift items weighing up to 35 pounds and frequently lift items weighing up to 20 pounds. (R. at 531.) He opined that Lovern should be able to sit for six hours in an eight-hour workday and stand for two hours in an eight-hour workday, assuming a positional change every 30 to 45 minutes. (R. at 530.) Dr. Blackwell further opined that Lovern should be able to operate a vehicle, as well as bend at the waist and kneel, one-third of the day. (R. at 530.) He opined that Lovern could not squat, stoop, crouch, crawl, work at unprotected heights or climb ladders or stairs. (R. at 530.) Dr. Blackwell opined that Lovern could perform above-head reaching activities one-third of the day with either arm and perform foot pedal operating one-third of the day with either foot. (R. at 530.) He placed no limitations on hand usage, including fine motor movements and skill activities of the hands, and he imposed no vision, communication, hearing or environmental limitations. (R. at 530-31.) Dr. Blackwell noted that his objective findings would correlate with Lovern's subjective complaints to the degree supported in his report. (R. at 531.) He further noted his belief, within a reasonable degree of medical probability, that Lovern was at maximum medical improvement, and he did not anticipate a significant change in limitations over the next 12 months. (R. at 531.) On a Range of Motion

---

[15] Romberg's sign refers to a swaying of the body or falling when standing with the feet close together and with the eyes closed. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 1525 (27th ed. 1988).

Form, Dr. Blackwell noted that Lovern's flexion in the thoracolumbar spine was limited to 60 degrees. (R. at 527.)

On April 12, 2010, Lovern reported to Weitzman that he had been having racing thoughts at night for the previous week and a half. (R. at 541.) He also continued to report being in a lot of pain. (R. at 541.) He reported experiencing some stress with extended family, but stated he was doing "ok." (R. at 541.) Lovern reported mild depression, irritability and crying spells, moderate anxiety and panic attacks and decreased sleep and energy. (R. at 541.) Weitzman described Lovern's mood as irritable with an appropriately anxious affect, and he had intact orientation and thought processes intact and fair judgment and insight. (R. at 541.) Her diagnoses remained unchanged. (R. at 541.)

A Physical Residual Functional Capacity Assessment was completed on April 27, 2010, by Dr. Richard Surrusco, M.D., a state agency physician. (R. at 83-84.) Dr. Surrusco found that Lovern could lift / carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 83.) He found that Lovern could stand and / or walk a total of two hours in an eight-hour workday with normal breaks and could sit for about six hours in an eight-hour workday with normal breaks. (R. at 83.) Dr. Surrusco found that Lovern must periodically alternate between sitting and standing to relieve pain and discomfort. (R. at 83.) He explained that Lovern's exertional limitations were due to back pain status-post laminectomy, which required alternating positions to gain relief. (R. at 83.) Dr. Surrusco found that Lovern could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. (R. at 83.) He further found that Lovern could never climb ladders, ropes or scaffolds, but that his ability to balance was unlimited. (R. at 83.) Dr. Surrusco found that Lovern must avoid all exposure to hazards such as

-16-

machinery and heights. (R. at 84.)

On April 28, 2010, Jeanne Buyck, PC, a state agency psychological consultant, completed a Psychiatric Review Technique form, ("PRTF"), on Lovern, finding that he had no restrictions on his activities of daily living, experienced only mild difficulties in maintaining social functioning, experienced moderate difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of extended duration decompensation. (R. at 80-81.) Buyck also completed a Mental Residual Functional Capacity Assessment, finding that Lovern's ability to carry out both very short and simple and detailed instructions was not significantly limited. (R. at 84-86.) Buyck further found that Lovern's symptoms would result in moderate difficulties with extended attention and concentration. (R. at 85.) She found that Lovern had mild difficulties with social interactions, while he was moderately limited in his ability to respond appropriately to changes in the work setting. (R. at 85-86.) Buyck concluded that Lovern's mental impairments were nonsevere and limited him to simple, routine work with limited contact with the public. (R. at 86.)

When Lovern returned to Dr. Vanover on April 28, 2010, he reported doing "much the same." (R. at 536-38.) Lovern stated that he believed he needed an MRI, but his insurance would not approve it. (R. at 536.) He reported that his blood pressure had been doing well at home. (R. at 536.) Dr. Vanover noted that Lovern had gained 10 pounds, had joint pain and suffered from depression and anxiety. (R. at 536.) Physical examination showed that Lovern's blood pressure was abnormal on that day,[16] his gait was slow and ambling, he exhibited marked

---

[16] The handwritten note indicates that Lovern's blood pressure reading was 150/?. The bottom number is illegible, but it clearly is a two-digit number. (R. at 537.)

tenderness in the lumbosacral area with spasm, and his range of motion of his back was decreased to 45 degrees flexion, 20 degrees extension and 20 degrees lateral motion. (R. at 537.) Lovern was oriented, and his memory, mood, affect, judgment and insight were normal. (R. at 537.) Dr. Vanover diagnosed chronic lumbosacral pain, hypertension, chronic depression and morbid obesity. (R. at 538.) She continued Lovern on medications and reminded him to remain as active as possible. (R. at 538.)

On May 12, 2010, Lovern reported to Weitzman that his back was hurting so badly, he was considering another surgery. (R. at 540.) Lovern endorsed mild depression, anxiety, irritability and crying spells and moderate panic attacks, as well as decreased energy and sleep. (R. at 540.) Mental status examination showed a depressed and irritable mood with an appropriately anxious affect, intact orientation and thought processes and fair judgment and insight. (R. at 540.) Weitzman did note, however, that Lovern was experiencing transient paranoia / delusions. (R. at 540.) Her diagnoses remained unchanged. (R. at 540.) On June 16, 2010, Lovern reported doing "ok," despite back pain. (R. at 539.) He reported increased family stress due to his father moving to Florida. (R. at 539.) He endorsed moderate depression, anxiety and panic attacks and mild irritability and crying spells, as well as decreased energy. (R. at 539.) Mental status examination revealed that Lovern had a depressed mood and was irritable at times, had an appropriately anxious affect, intact orientation and thought processes and fair judgment and insight. (R. at 539.) No paranoia or delusions were noted. (R. at 539.) Weitzman added a previous diagnosis of major depressive disorder, recurrent episode, moderate, back into her diagnoses of Lovern. (R. at 539.) On July 14, 2010, Lovern reported doing "ok" except for pain. (R. at 565.) He endorsed moderate depression, anxiety, irritability, crying spells and panic attacks, as well as

decreased energy and variable sleep. (R. at 565.) Mental status examination showed a depressed and irritable mood, an anxious and appropriate affect, intact orientation and thought processes and fair judgment and insight. (R. at 565.) Weitzman again noted transient paranoia / delusions. (R. at 565.) Weitzman, nonetheless, noted that Lovern was "maintaining stability," and she diagnosed a mood disorder and generalized anxiety disorder. (R. at 565.)

On July 26, 2010, Jo McClain, PC, a state agency psychological consultant, completed another PRTF, finding that Lovern was mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning, experienced moderate difficulties in maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation of extended duration. (R. at 96-97.) McClain also completed a Mental Residual Functional Capacity Assessment, finding that Lovern was moderately limited in his ability to understand and remember detailed instructions due to a combination of anxiety and depression. (R. at 99-101.) McClain also found that Lovern was moderately limited in his ability to carry out detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to respond appropriately to changes in the work setting and to set realistic goals or make plans independently of others. (R. at 100-01.) McClain specified that Lovern's depression, anxiety and irritability resulted in some difficulties with social interactions. (R. at 101.)

Dr. Bert Spetzler, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment on Lovern on July 26, 2010, finding that he could lift / carry items weighing up to 20 pounds occasionally and up to 10 pounds frequently. (R. at 97-99.) Dr. Spetzler found that Lovern could stand / walk a total of about six hours in an eight-hour workday and sit a total of about six hours in an eight-hour workday, but that he must periodically alternate between sitting and standing to relieve pain and discomfort. (R. at 98.) He found that Lovern could occasionally climb ramps and stairs, stoop, kneel, crouch and crawl, but never climb ladders, ropes or scaffolds. (R. at 98.) Dr. Spetzler found that Lovern should avoid all exposure to hazards such as machinery and heights. (R. at 99.)

When Lovern returned to Dr. Vanover on July 27, 2010, he reported quite severe low back pain with lifting or straining in any way. (R. at 543-45.) He reported lying around and doing small chores around the house.(R. at 543.) Lovern reported depression due to an inability to work.  (R. at 543.) He stated that medications helped, but not completely, and that he took pain medication nearly every day. (R. at 543.) Dr. Vanover noted joint pain and depression and that Lovern's blood pressure was 140/100. (R. at 543-44.) Physical examination showed that his gait was slow and ambling, and he exhibited tenderness along the lumbosacral area with decreased range of motion of the back. (R. at 544.) Lovern's orientation, memory, judgment and insight were deemed normal, but his mood and affect were depressed.  (R. at 544.)  Dr. Vanover diagnosed chronic low back pain, depression and hypertension, she continued him on medications and reminded him to stay as active as possible. (R. at 545.)

On August 10, 2010, Weitzman completed another Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Lovern, finding that he had a

fair ability to follow work rules, to relate to co-workers, to interact with supervisors, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 548-50.) She found that Lovern had a poor or no[17] ability to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out both detailed and complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 548-49.) Weitzman opined that Lovern would be absent from work more than two days monthly due to his impairments or treatment. (R. at 550.) She stated that Lovern had undergone two to three back surgeries[18] and had debilitating chronic pain. (R. at 550.) She further stated that Lovern would not react in a stable manner and was very limited in what he could do physically. (R. at 549.) Weitzman emphasized that Lovern was not a malingerer and that his pain and limitations were real. (R. at 549.)

On August 25, 2010, Dr. Vanover also completed an Assessment Of Ability To Do Work-Related Activities (Physical) on Lovern, finding that he could lift / carry items weighing up to 10 pounds occasionally and up to eight pounds frequently. (R. at 552-54.) She also found that Lovern could stand / walk a total of two hours in an eight-hour workday, but could do so for only 30 minutes at a time. (R. at 552.) Dr. Vanover, likewise, found that Lovern could sit a total of two hours in an eight-hour workday, but only for 30 minutes at a time. (R. at 553.) She found that he could frequently balance, occasionally climb and never stoop, kneel,

---

[17] A poor or no ability means there is "[n]o useful ability to function" in this area. (R. at 548.)

[18] The record substantiates only one prior back surgery, and Lovern does not claim to have undergone any other such surgeries.

crouch or crawl.  (R. at 553.) Dr. Vanover found that Lovern's abilities to reach and to push / pull were affected by his impairments, but she did not specify how. (R. at 553.) She imposed no environmental restrictions. (R. at 554.) Dr. Vanover found that Lovern would miss more than two days of work monthly due to his impairments or treatment. (R. at 554.) She did not specify any medical findings to support her assessment. (R. at 552-54.)

On August 25, 2010, Lovern returned to Weitzman, reporting that he was not doing well, as he was having sweats, dizziness and euphoric feelings. (R. at 564.) He reported moderate depression, anxiety, irritability, crying spells and panic attacks. (R. at 564.) Mental status examination showed a depressed mood, an anxious and appropriate affect, intact orientation and thought processes, no paranoia or delusions and fair judgment and insight. (R. at 564.) Weitzman noted that Lovern was not doing well, and she diagnosed a mood disorder, generalized anxiety disorder and agoraphobia with panic disorder. (R. at 564.)

Lovern presented to the emergency department at Mountain View Regional Medical Center on August 27, 2010, with complaints of dizziness, vertigo, altered sensations and headache off and on for the previous few days. (R. at 587-96.) His blood pressure was 148/102, and he was mildly anxious. (R. at 589.) Lovern had normal motor strength and sensation. (R. at 589.)  He was diagnosed with dizziness and vertigo and was written prescriptions for Antivert and Vistaril. (R. at 589.) Lovern was discharged home in stable condition. (R. at 589.)

Lovern again presented to the emergency department at Mountain View Regional Medical Center on September 5, 2010, with complaints of intermittent dizziness and vertigo and increased stress. (R. at 569-86.) His blood pressure was

elevated at 155/101 lying down, 165/118 sitting and 158/112 standing. (R. at 582.) Lovern was alert and fully oriented, and all four extremities were of equal strength. (R. at 582.) He was diagnosed with orthostatic blood pressure / dizziness and was given Xanax and Zofran. (R. at 581-83.) Lovern was discharged in stable condition. (R. at 581-82.)

Lovern saw Dr. Vanover on September 7, 2010, for a follow up regarding his emergency room visits. (R. at 610-12.) He stated that he was "extremely anxious" most of the time. (R. at 610.) Lovern reported taking an occasional Xanax, which helped him. (R. at 610.) He further reported that his pain medication worked "fairly well," but he still had a great deal of pain. (R. at 610.) Lovern described his hypertension as under good control. (R. at 610.) Physical examination showed that Lovern's gait was slightly unsteady, and there was tenderness over the lumbosacral area. (R. at 611.) Range of motion of the back was decreased secondary to pain and body habitus. (R. at 611.) Lovern's orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 611.) Dr. Vanover diagnosed chronic low back pain, hypertension and an anxiety disorder, and she prescribed Xanax XR. (R. at 612.)

Lovern returned to Weitzman on September 22, 2010, noting that he was doing "ok." (R. at 563.) Nonetheless, he reported having been to the emergency room two to three times with panic and that he had been placed on controlled release Xanax. (R. at 563.) Lovern stated that he felt "so much better" without the panic. (R. at 563.) He reported moderate depression, anxiety, irritability, crying spells and panic attacks, as well as decreased energy. (R. at 563.) Mental status examination showed a depressed and irritable mood, an anxious and appropriate affect, intact orientation and thought processes, no paranoia / delusions and fair

judgment and insight. (R. at 563.) Weitzman noted that Lovern was "maintaining decreased panic," and she again diagnosed a mood disorder, generalized anxiety disorder and agoraphobia with panic disorder. (R. at 563.)

When Lovern saw Dr. Vanover on October 25, 2010, he reported that Xanax XR was helping with anxiety, but he remained "quite anxious" and had difficulty sleeping due to pain. (R. at 607-09.) Lovern exhibited tenderness over the lumbosacral area and decreased range of motion secondary to pain and habitus. (R. at 608.) His orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 608.) Dr. Vanover diagnosed chronic low back pain, chronic anxiety, depression and hypertension. (R. at 609.)

Dr. Vanover also completed a Medical Assessment Of Ability To Do Work-Related Activities (Mental) on Lovern on August 25, 2010, finding that Lovern had a good ability to follow work rules and to maintain personal appearance, a fair ability to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 555-57.) Dr. Vanover further found that Lovern had a poor or no ability to deal with work stresses, to maintain attention and concentration, and to understand, remember and carry out both detailed and complex instructions. (R. at 555-56.) She found that Lovern would be absent from work more than two days monthly due to his impairments or treatment. (R. at 557.) Again, Dr. Vanover provided no medical or clinical findings to support her assessment. (R. at 555-57.)

When Lovern returned to Weitzman on December 10, 2010, he reported

moderate depression, anxiety, irritability and panic attacks, mild crying spells and decreased energy. (R. at 562.) Mental status examination showed a depressed mood, an anxious affect, intact orientation and thought processes, no paranoia or delusions and fair judgment and insight. (R. at 562.) Weitzman noted no progress and no improvement in Lovern's pain. (R. at 562.) Her diagnoses remained unchanged. (R. at 562.)

Lovern returned to Dr. Vanover on December 29, 2010, for a routine follow up. (R. at 604-06.) He reported feeling "neither better nor worse." (R. at 604.) He exhibited tenderness over the lumbosacral muscles and decreased range of motion secondary to pain and body habitus. (R. at 605.) Lovern's orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 605.) Dr. Lovern diagnosed chronic low back pain, depression, hypertension and chronic anxiety. (R. at 606.)

By January 10, 2011, Lovern reported moderate depression and anxiety, but mild irritability, crying spells and panic attacks. (R. at 561.) Mental status examination showed a depressed mood, anxious affect, intact orientation and thought processes, no paranoia or delusions and fair judgment and insight. (R. at 561.) Weitzman noted that Lovern was "holding steady," and her diagnoses remained unchanged. (R. at 561.) On February 10, 2011, Lovern reported being denied on his disability claim. (R. at 560.) He also reported episodic panic, and he stated that he had a family history of "bad nerves." (R. at 560.) He stated that he tried to stay busy to avoid becoming so "panicky." (R. at 560.) Lovern reported moderate depression, anxiety, irritability, crying spells and panic attacks. (R. at 560.) Mental status examination showed a depressed mood, anxious affect, intact orientation and thought processes, transient paranoia / delusions and fair judgment

and insight. (R. at 560.) Weitzman stated that Lovern was decompensating due to pain and increased panic. (R. at 560.) Her diagnoses remained unchanged. (R. at 560.)

Lovern returned to Dr. Vanover on April 26, 2011, stating that his anxiety was not controlled even with an increased dose of Xanax XR. (R. at 601-03.) He further noted continued "quite severe" pain. (R. at 601.) Lovern stated that, although his pain medication helped, he still could not do much of anything. (R. at 601.) Dr. Vanover noted that Lovern had gained 18 pounds, his blood pressure was 126/92, and he exhibited tenderness over the lumbosacral muscles and decreased range of motion secondary to pain and body habitus. (R. at 602.) Orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 602.) Dr. Vanover diagnosed chronic low back pain, depression and chronic anxiety, and she increased Lovern's dosage of Xanax XR. (R. at 603.)

May 9, 2011, Lovern reported "doing well" with controlled release Xanax, stating that he was much less stressed and that he slept better. (R. at 559.) Weitzman noted that Lovern's Xanax dosage had been increased. (R. at 559.) Lovern reported moderate depression, irritability and panic attacks and mild anxiety and crying spells. (R. at 559.) Mental status examination showed a depressed mood, anxious affect, intact orientation and thought processes, transient paranoia / delusions and fair judgment and insight. (R. at 559.) Weitzman stated that Lovern was "holding steady," and her diagnoses remained the same. (R. at 559.) On June 17, 2011, Lovern reported doing "fair," noting increased pain due to the weather. (R. at 558.) He reported moderate depression, irritability and panic attacks and mild anxiety and crying spells. (R. at 558.) Mental status examination showed a depressed and irritable mood, anxious affect, intact orientation, racing

thought processes, transient paranoia / delusions and fair judgment and insight. (R. at 558.) Weitzman noted that Lovern was "maintaining," and she diagnosed a mood disorder, agoraphobia with panic disorder, social phobia and an anxiety state, not otherwise specified. (R. at 558.)

On July 21, 2011, Weitzman completed another Medical Assessment Of Ability To Do Work-Related Activities (Mental), finding that Lovern had a fair ability to maintain personal appearance and a poor or no ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out simple, detailed and complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 566-68.) Weitzman stated that Lovern's level of limitations was so restrictive to him physically, that he was unable to work at any competitive level. (R. at 568.) She found that he would be absent from work more than two days monthly due to his impairments or treatment. (R. at 568.)

On July 26, 2011, Lovern complained of increased right leg pain, and he requested an MRI. (R. at 598-600.) He stated that lifting increased his pain. (R. at 598.) Lovern reported continued anxiety, but noted his medication was working "fairly well." (R. at 598.) Lovern's blood pressure was 118/96, and he exhibited tenderness over the lumbosacral muscles and decreased range of motion secondary to pain. (R. at 599.) Orientation, memory, mood, affect, judgment and insight all were deemed normal. (R. at 599.) Dr. Vanover diagnosed chronic low back pain, chronic anxiety and hypertension. (R. at 600.)

On August 17, 2011, Lovern saw Weitzman with complaints of moderate depression, anxiety, irritability, crying spells and panic attacks. (R. at 613.) Mental status examination showed a depressed mood, anxious affect, intact orientation and thought processes, no paranoia / delusions and fair judgment and insight. (R. at 613.) Weitzman diagnosed a mood disorder, agoraphobia with panic disorder and social phobia. (R. at 613.)

A lumbar spine MRI dated August 30, 2011, showed previous laminectomies at L4 and L5 and small central disc protrusions at these levels with only mild foraminal encroachment on the left at L5-S1. (R. at 614-15.)

Dr. Vanover completed another Medical Assessment Of Ability To Do Work-Related Activities (Mental) on September 9, 2011, finding that Lovern had a good ability to understand, remember and carry out simple job instructions, to maintain personal appearance, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability, a fair ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration and to understand both detailed and complex job instructions and a poor or no ability to deal with work stresses. (R. at 617-19.) Dr. Vanover found that Lovern would miss more than two work days monthly due to his impairments or treatment. (R. at 619.) She did not state any medical or clinical findings to support her assessment. (R. at 617-19.)

Dr. Vanover also completed an Assessment Of Ability To Do Work-Related Activities (Physical) on that date, finding that Lovern could lift / carry items weighing up to 15 pounds occasionally and up to eight pounds frequently. (R. at

620-22.) She found that Lovern could stand / walk a total of two hours in an eight-hour workday, but for 30 minutes at a time, and that he could sit for a total of two hours in an eight-hour workday, but for 30 minutes at a time. (R. at 620-21.) Dr. Vanover found that Lovern could frequently balance, occasionally climb and never stoop, kneel, crouch or crawl. (R. at 621.) She found that his ability to push / pull was affected by his impairments, but she did not specify how. (R. at 621.) Dr. Vanover found that Lovern could not work around moving machinery or vibration. (R. at 622.) She opined that he would miss more than two days of work monthly due to his impairments or treatment. (R. at 622.) Dr. Vanover failed to specify what medical findings supported her assessment. (R. at 620-22.)

Lovern returned to Weitzman on September 28, 2011, stating he had experienced increased pain that week which prevented him from dressing himself two or three days. (R. at 624.) He also reported having "much more" panic, usually in the evenings. (R. at 624.) Lovern reported moderate depression, anxiety, irritability, crying spells and panic attacks. (R. at 624.) Mental status examination showed a depressed and irritable mood, an anxious affect, intact orientation and thought processes, transient paranoia / delusions and fair judgment and insight. (R. at 624.) Weitzman stated that Lovern was decompensating secondary to increased pain. (R. at 624.) She diagnosed a mood disorder, social phobia, agoraphobia with panic disorder and anxiety state, not otherwise specified. (R. at 624.)

On October 11, 2011, Dr. Vanover opined that Lovern's condition met or equaled the medical listing found at 20 C.F.R. Part 404, Subpart P, App. 1, § 1.04(A), for disorders of the spine. (R. at 623.)

Weitzman completed a Medical Assessment Of Ability To Do Work-Related

Activities (Mental) on October 11, 2011, finding that Lovern had a fair ability to interact with supervisors, to understand, remember and carry out simple job instructions and to maintain personal appearance and a poor or no ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out both detailed and complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 625-27.) Weitzman stated that Lovern had so much chronic pain that he was incapable of movement, lifting and turning and that he had poor focus. (R. at 627.) Weitzman further stated that he had significant anxiety and depression due to his condition. (R. at 627.) Finally, Weitzman found that Lovern would be absent from work more than two days monthly due to his impairments or treatment. (R. at 627.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2013); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2013).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Lovern argues that the ALJ's decision denying his claim for DIB benefits is not based on substantial evidence. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-11.) In particular, he argues that the ALJ erred by failing to find that he suffered from severe mental impairments. (Plaintiff's Brief at 6-8.) Lovern also argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 8-11.)

Lovern first argues that the ALJ erred by failing to find that he suffered from severe mental impairments. (Plaintiff's Brief at 6-8.) Based on my review of the record, I find that substantial evidence does not support the ALJ's finding that he did not suffer from a severe mental impairment during the time period relevant to the disability decision. As an initial matter, I note that the ALJ, in deciding this claim, was in no way bound by the ALJ's decision on Lovern's previous claim. At each decision making level, the Agency recognizes the traditional rule that, absent identity of claims, principles of res judicata do not apply. *See Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476 (4th Cir. 1999). The Social Security Administration's treatment of later-filed applications as separate claims is logical

and sensible, reflecting the reality that the mere passage of time often has deleterious effect on a claimant's physical or mental condition. *See Albright*, 174 F.3d at 476. Considering the entirety of the psychological evidence contained in this record, however, I find that substantial evidence does not support the ALJ's finding that Lovern did not have a severe mental impairment during the relevant time period.

The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a) (2013). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering simple job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. § 404.1521(b) (2013). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.'"'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984) (citations omitted). I find that evidence relevant to the time period at issue here shows that Lovern suffered from a severe mental impairment.

Weitzman, Lovern's treating mental health source, opined in November 2009 that he was moderately limited in all work-related mental abilities, also noting that physical pain would interfere with his ability to focus. By August 2010, Weitzman opined that Lovern had a fair ability to follow work rules, to

relate to co-workers, to interact with supervisors, to understand, remember and carry out simple job instructions and to maintain personal appearance, but a poor or no ability to deal with the public, to use judgment, to deal with work stresses, to function independently, to maintain attention and concentration, to understand, remember and carry out both detailed and complex job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. In July 2011, Weitzman opined that Lovern had a poor or no ability in all areas of work-related mental abilities, with the exception of a fair ability to maintain personal appearance. In October 2011, Weitzman opined that Lovern had a poor or no ability in all areas of work-related mental abilities, with the exception of interacting with supervisors, understanding, remembering and carrying out simple job instructions and maintaining personal appearance, which Weitzman deemed fair. Counseling sessions with Weitzman from March 2010 through September 2011 consistently showed that Lovern had a depressed and irritable mood and anxious affect. Despite some reports of medication helping his anxiety, Lovern also consistently reported moderate panic attacks, and Weitzman noted the presence of transient paranoia / delusions on more than one occasion. Over this time, Weitzman diagnosed Lovern with major depressive disorder, mood disorder, generalized anxiety disorder, social phobia, agoraphobia with panic disorder and an anxiety state. In January 2011, and again in September 2011, Weitzman noted that Lovern was decompensating. Thus, I find that Weitzman's opinions are supported by her treatment notes of Lovern.

Dr. Vanover, Lovern's treating physician, also completed multiple mental assessments of Lovern. In December 2009, Dr. Vanover opined that Lovern was either moderately limited or markedly limited in all areas of work-related mental abilities. In August 2010, Dr. Vanover opined that Lovern had a fair ability to

-33-

relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. She opined that Lovern had a poor or no ability to deal with work stresses, to maintain attention and concentration and to understand, remember and carry out both detailed and complex job instructions. In September 2011, Dr. Vanover opined that Lovern had a fair ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention and concentration and to understand, remember and carry out both detailed and complex job instructions. Dr. Vanover opined that Lovern had a poor or no ability to deal with work stresses. While Dr. Vanover is not a mental health provider, she did manage Lovern's mental health impairments with medication on a long-term basis. That being the case, she monitored his psychological condition at each medical visit.

Lastly, the state agency psychological consultants' reports also contain findings that are consistent with a finding of a severe mental impairment. For instance, in April 2010, Buyck opined that Lovern was moderately limited in his ability to sustain extended attention and concentration and in his ability to respond appropriately to changes in the work setting. In July 2010, McClain also found that Lovern was moderately limited in his ability to maintain concentration, persistence or pace, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes and to respond appropriately to changes in the work setting.

All of this being the case, I find that substantial evidence does not support the ALJ's finding that Lovern did not suffer from a severe mental impairment. The uncontradicted psychological evidence of record shows that Lovern's mental impairments were more than slight abnormalities that resulted in more than a minimal effect on him so that they would be expected to interfere with his ability to work. That being the case, I will remand the case to the ALJ for further consideration of the effect of Lovern's severe mental impairments on his ability to work.

Next, Lovern argues that the ALJ erred in his residual functional capacity finding. Lovern argues that the ALJ was bound to accept the prior ALJ's finding that he retained the residual functional capacity to perform a limited range of simple, repetitive, sedentary work that allowed for a sit / stand option and involved only occasional postural activities and occasional interaction with the public and co-workers. However, as stated previously, a second or successive disability application for a previously unadjudicated period, as here, constitutes a new claim. Thus, absent an identity of claims, principles of res judicata do not apply. There is no identity of claims here, as the current application seeks benefits for a different time period than the prior claim. Therefore, the ALJ is not bound by the prior ALJ's residual functional capacity finding.

As I already am remanding the case to the ALJ with regard to Lovern's mental impairments, I only will discuss this argument with respect to his physical residual functional capacity. The ALJ found that Lovern had the residual functional capacity to perform sedentary work with occasional stooping, kneeling, crawling or crouching, along with a postural change every 45 minutes. For the reasons that follow, I find that such a physical residual functional capacity is

supported by substantial evidence. Although the record reveals that Lovern underwent back surgery in 2000, he testified that his condition improved for a couple of years before he began experiencing pain again. The record shows that Lovern even continued to work until 2008. The ALJ gave Dr. Vanover's opinion that Lovern's impairments met or equaled the listing for disorders of the spine, found at § 1.04(A), little weight because it was conclusory and because there was insufficient medical evidence to support the opinion as of Lovern's alleged onset date. To meet § 1.04(A), a claimant must show a herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture resulting in the compromise of a nerve root or the spinal cord with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test (both sitting and supine). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A) (2013). Here, an MRI dated August 2011 showed only small central disc protrusions with no more than mild foraminal encroachment. There is no other diagnostic testing included in the record. Thus, there is no objective evidence to support Dr. Vanover's opinion that Lovern's back impairment met or equaled § 1.04(A).

The medical evidence of record also supports the ALJ's finding that Lovern did not suffer from a disabling back impairment. The MRI of Lovern's lumbosacral spine, mentioned above, showed only previous laminectomies at L4 and L5 and small central disc protrusions at these levels with only mind foraminal encroachment on the left at L5-S1. Furthermore, while Dr. Vanover's physical examination findings consistently showed marked tenderness over the lumbosacral

-36-

area with a restricted range of motion of the back, Lovern had a normal station with a slow and ambling gait. Dr. Vanover treated Lovern conservatively with medications. None of Dr. Vanover's treatment notes contain any physical restrictions on Lovern's activities. In fact, she consistently advised him to remain as active as possible. Dr. Vanover also never referred him to pain management, a neurologist or a neurosurgeon, and she never documented any discussions of a second surgery with Lovern. For these reasons, I find that the restrictions contained in the physical assessments completed by Dr. Vanover in December 2009, August 2010, September 2011 are inconsistent with her own treatment notes and course of treatment of Lovern's back impairment.

The ALJ gave partial weight to the opinions of Dr. Blackwell, the consultative examiner, noting that he gave too much weight to Lovern's subjective complaints in severely limiting his nonexertional functions. The ALJ found that Dr. Blackwell's findings that Lovern could not stoop, crouch, crawl, climb ladders or climb stairs were not supported by his own evaluation of Lovern. I agree. Dr. Blackwell's physical examination of Lovern revealed a symmetrical and balanced gait and good and equal shoulder and iliac crest height bilaterally. He exhibited tenderness in the lumbar musculature on the left and in the thoracic muscles on the right, but upper and lower joints had no effusions or obvious deformities. Upper and lower extremities also were normal for size, shape, symmetry and strength, and Lovern's grip strength was good. Fine motor movements and skill activities of the hands were normal, as were reflexes. Romberg's sign was negative, and proprioception was intact. Dr. Blackwell opined that Lovern could lift items weighing up to 35 pounds occasionally and up to 20 pounds frequently, he could sit for six hours in an eight-hour workday and stand for two hours in an eight-hour workday, assuming a positional change every 30 to 45 minutes. Thus, Dr.

Blackwell's relatively benign physical examination findings do not support the restrictive limitations he imposed on Lovern.

Additionally, as noted by the ALJ, despite Lovern's allegations of difficulties ambulating and occasional use of a cane, it was documented in September 2010 that he was able to ambulate independently and could perform all activities of daily living without assistance. Also, despite Lovern's complaints of constant severe pain, he testified that he took his pain medication only sparingly. Finally, despite Lovern's testimony that he had reduced muscle mass in his leg, there is no evidence to support this allegation. As stated above, Dr. Blackwell described his upper and lower extremities as normal for size, shape, symmetry and strength, and a loss of muscle mass was never documented by Dr. Vanover.

It is for all of the above-stated reasons that I find that the ALJ's physical residual functional capacity finding is supported by substantial evidence. However, for the reasons stated herein, I find that substantial evidence does not support the Commissioner's decision to deny benefits, and I will vacate the Commissioner's decision denying benefits and remand the case to the Commissioner for further consideration with respect to Lovern's mental impairments. An appropriate order will be entered.

DATED:     September 29, 2014.

s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE